IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SB PREMIUM, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. **3:17-CV-931-L** |
| **WOLFPACK WHOLESALE, INC.;** | § | |
| **WOLFPACK WHOLESALE 2, LLC;** | § | |
| **VAPEWILD, LLC; VAPORIUM, LLC** | § | |
| **d/b/a SKYLINE VAPOR; ERIC TURNER;** | § | |
| **KEVIN THURMAN; and MATTHEW** | § | |
| **WEINER,** | § | |
| | § | |
| Defendants. | § | |
| | § | |
| **WOLFPACK WHOLESALE, INC.,** | § | |
| | § | |
| Third Party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **SB PRODUCTS, a Texas General** | § | |
| **partnership; TIFFANY GRESHAM;** | § | |
| **LARRY GRESHAM; WHITE LION** | § | |
| **INVESTMENTS, LLC d/b/a TRITON** | § | |
| **DISTRIBUTION; and TODD WAGES,** | § | |
| | | |
| Third Party Defendants. | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Third Party Defendants' Motion to Dismiss Certain Claims in Wolfpack

Wholesale, Inc.'s First Amended Third Party Complaint (Doc. 53), filed October 20, 2017. Third

Party Defendants SB Products ("SB Products"), Tiffany Gresham, and Larry Gresham (the

"Greshams") (collectively, the "Third Party Defendants") move, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to dismiss the claims asserted by Third Party Plaintiff Wolfpack Wholesale, Inc.

("Wolfpack"). Alternatively, Third Party Defendants move for a more definite statement under Rule 12(e) and request that the court order Wolfpack to amend its pleadings. After considering the motion, briefs, pleadings, and applicable law, the court **denies** Third Party Defendants' Motion to Dismiss Certain Claims in Wolfpack Wholesale, Inc.'s First Amended Third Party Complaint and alternative motion for more definite statement (Doc. 53).

## I.    Factual and Procedural Background

Plaintiff SB Premium, LLC ("SB Premium" or "Plaintiff") brought this action on March 31, 2017, against Wolfpack Wholesale, Inc.; Wolfpack Wholesale 2, LLC; Vapewild, LLC; Vaporium, LLC d/b/a Skyline Vapor; Eric Turner; Kevin Thurman; and Matthew Weiner ("Defendants"), asserting trademark claims under 15 U.S.C. § 1125 and Texas common law, unfair competition under Texas common law, and an equitable claim for unjust enrichment. SB Premium brings this action against Defendants as the assignee of Texas general partnership SB Products ("SB Products" or "SB Parternship") with respect to claims and rights regarding the trademarks and trade dresses at issue in this lawsuit. According to SB Premium's First Amended Complaint ("Complaint"):

> On or about December 1, 2013, SB Products entered an **Exclusive Distribution Agreement** with Wolfpack Imports, LLC (now known as Defendant Wolfpack Wholesale, Inc.) pursuant to which SB Products granted Wolfpack Imports, LLC the exclusive right to market, sell, and distribute SB Products' E-Liquid products worldwide using SB Products' distinctive packaging and bearing SB Products' trademarks.

Pl.'s First Am. Compl. ¶ 17 (emphasis added). At the core of the claims asserted by SB Premium is its allegation that Defendants violated SB Products' trademark and trade dress rights in selling SB Products' e-liquid products, without SB Products' consent, after SB Products terminated "its relationship with Wolfpack" on or about May 2016. *Id*. ¶ 29. By "relationship," SB Product

appears to refer to the parties' "Exclusive Distribution Agreement," the only agreement referenced in its Complaint. *See id.* ¶ 17.

On July 25, 2017, Wolfpack filed it Original Third Party Complaint against SB Products, which the parties also refer to as "SB Partnership"; the Greshams, as the owners and general partners of SB Products; White Lion Investments, LLC d/b/a Triton Distribution ("Triton"); and Todd Wages. In its First Amended Third Party Complaint ("Third Party Complaint") (Doc. 50), filed on October 17, 2017, Wolfpack asserts a number of claims against Third Party Defendants. Third Party Defendants' Motion to Dismiss and this opinion focus only on Wolfpack's claims for breach of contract, fraud, and request for attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code.

Regarding its contract claim, Wolfpack alleges that, in 2014, SB Partnership and Wolfpack entered into a valid and enforceable "Exclusive Distribution Agreement" that, by mutual agreement, replaced the parties' "Original Distribution Agreement" and gave Wolfpack the exclusive right to market and sell SB Partnership's entire line of products, including its e-liquid products. Wolfpack Third Party Compl. ¶ 10. Copies of the original "Product Distribution Agreement," which Wolfpack refers to as the "Original Distribution Agreement," and "Exclusive Distribution Agreement" are attached as Exhibits A and B to Wolfpack's Third Party Complaint.

The Original Distribution Agreement, which is between SB products and Wolfpack, is signed by Tiffany Gresham and states that it became effective "as of August 22, 2013," and "terminated automatically on March 01, 2014." Wolfpack Third Party Compl., Ex. A. 1-3. Under the Original Distribution Agreement, Wolfpack was granted the "exclusive right to sell" SB Products' "Suicide Bunny Line of E-Liquid" products. *Id.* at 1. Under the Original Distribution Agreement, SB

Products agreed to deliver to Wolfpack between 3,000 and 5,000 bottles of Suicide Bunny Line E-Liquid twice per month, and Wolfpack agreed to pay SB Products bi-monthly "$8 per 30 ml of [E]-Liquid of Suicide Bunny." *Id.*

The Exclusive Distribution Agreement, which is not signed by SB Products or Wolfpack, includes an effective date of May 15, 2014, and provides that it "shall continue in force for a period until terminated by either party. . . . Either party hereto may terminate this Agreement at any time by providing a thirty (30) day written notice to the other party." Wolfpack Third Party Compl., Ex. B ¶ 2.1. The agreement also includes a guaranty whereby Wolfpack agrees, as "Distributer," to purchase "an amount of Product not less than the equivalent of $30,000 per month . . . at 30 ml per bottle," *id.* ¶ 3.2, and defines "Products" as SB Products' "products marketed under the Suicide Bunny Premium E-Juice brand." Wolfpack Third Party Compl., Ex. B (introduction). Under the Exclusive Distribution Agreement, Wolfpack was granted the "exclusive right to market, sell and distribute the Products worldwide." *Id.* ¶ 1.1.

Although unsigned, Wolfpack alleges that the parties' agreement to execute the Exclusive Distribution Agreement is evidenced by their written communications and performance under that agreement:

> 11. At that time, a copy of the Exclusive Distributorship Agreement was sent to SB Partnership. SB Partnership represented to Wolfpack that it accepted and would sign that contract and gave Wolfpack written confirmation of its acceptance of the contract through a **series of emails**. A true and correct copy of one of those emails is attached hereto as Exhibit C and incorporated by reference.
>
> 12. **Additionally, throughout the relationship between the parties, the terms of the Exclusive Distributorship Agreement were acknowledged and its terms were followed in numerous ways including, inter alia, email communications, placing orders for product, delivering product, paying for product, marketing product, etc.**

13. With the relationship continuing to grow, SB Partnership sold over $5.5 million worth of wholesale e-liquid to Wolfpack in 2014. Less than two years before, SB Partnership had sold $0 worth of wholesale e-liquid sales.

15. In 2015, SB Partnership sold over $11.5 million of wholesale e-liquid to Wolfpack, nearly doubling the amount of e-liquid wholesale product that SB Partnership had sold in 2013 and 2014 combined.

. . . .

21. In the spring of 2016, while the Exclusive Distribution Agreement was still in full force and effect, Wolfpack purchased and paid for about $2,400,000.00 dollars in e-liquid products from SB Partnership in anticipation of ramping up its international sales efforts for those products.

Wolfpack Third Party Compl. ¶¶ 11-13, 15, 21 (emphasis added).

In the e-mail exchange included in Exhibit C to Wolfpack's Complaint, Eric Turner, the owner and founder of Wolfpack, states on April 18, 2014, to Tiffany (Pip) Gresham and Scott Gresham: "Pip/Scott, I have worked up a revision of the previous contract. I changed the terms to net 10 as well as upped the minimum to 30k bottles. I have also made it a contract in force until one of us decides to terminate it. Please let me know what, if any, changes you would like to have made." Wolfpack Third Party Compl. Ex. C.  On April 21, 2014, Tiffany Gresham responds: "It looks like this is fine for us. I will read it through today. I am sorry I didn[']t get to it this weekend. It was a busy one." *Id.*

Wolfpack alleges that the Exclusive Distribution Agreement, by its terms, was to remain in effect until terminated by either party upon thirty-days written notice.  Wolfpack further alleges that SB Partnership and the Greshams breached the Exclusive Distribution Agreement by: (1) distributing some of SB Partnership's products through Triton while the Exclusive Distribution Agreement was

in effect; and (2) terminating the Exclusive Distribution Agreement without notice in contravention

of the agreement's terms.

Regarding its fraud claim, Wolfpack alleges that SB Partnership and the Greshams:

made fraudulent representations and/or omissions of material facts to induce Wolfpack to purchase large amounts of SB Partnership products and to incur substantial investment costs in connection with expanding its distribution networks and establishing a warehouse distribution facility in Ireland to exclusively sell SB Partnership products. SB Partnership was fully aware of Wolfpack's planned investments and encouraged Wolfpack to move forward with those plans. Upon information and belief, at the same time SB Partnership, Larry Gresham and Tiffany Gresham were secretly conspiring with Triton to terminate the Exclusive Distributorship Agreement and replace Wolfpack with Triton. These fraudulent representations and/or omissions of fact were material and were relied upon by Wolfpack to its detriment.

Wolfpack Third Party Compl. ¶ 35. Wolfpack also specifically alleges as follows:[1]

14. In reliance on the terms of the Original Distribution Agreement, the Exclusive Distribution Agreement, the representations of SB Partnership and its principals, and the continued success of the parties working together, Wolfpack expanded its distribution networks and made continuous and systematic purchases of e-liquid products from SB Partnership in order to exercise its exclusive right to market and sell those products.

15. In 2015, SB Partnership sold over $11.5 million of wholesale e-liquid to Wolfpack, nearly doubling the amount of e-liquid wholesale product that SB Partnership had sold in 2013 and 2014 combined.

16. Wolfpack held regular weekly meetings with SB Partnership during this time frame to discuss Wolfpack's marketing and distribution plans for SB Partnership's products and to coordinate those efforts with SB Partnership. These discussions included Wolfpack's plans to arrange for the warehouse distribution facility in Ireland. SB Partnership, Tiffany Gresham and Larry Gresham were, therefore, all aware of these actions being taken by Wolfpack. At no time during this time frame did SB Partnership, Tiffany Gresham or Larry Gresham mention any plans to terminate the Exclusive Distributorship Agreement. In fact, Tiffany Gresham and Larry Gresham encouraged Wolfpack to move forward with its expanded sales efforts, including the establishment of the warehouse distribution facility in Ireland.

---

[1] Some of these allegations are directed at Wolfpack's other claims.

17. Specifically, in September of 2015, Wolfpack had meetings with SB Partnership, Larry Gresham and Tiffany Gresham to discuss the possibility of establishing a warehouse facility in Ireland to increase distribution of SB Partnership's products in Europe. Wolfpack stated that it would fund the up-front costs of that venture if: (i) SB Partnership would provide discounted prices to Wolfpack for SB Partnership products that would be sold in Europe through the new facility in Ireland; and (ii) SB Partnership, Larry Gresham and Tiffany Gresham would commit to a long term arrangement for Wolfpack to be the exclusive distributor of SB Partnership products in Europe so that Wolfpack could recoup the costs associated with the establishment of the Ireland facility. SB Partnership, Larry Gresham and Tiffany Gresham said that they would commit to this arrangement and encouraged Wolfpack to move forward with the Ireland facility. Wolfpack proceeded in reliance upon the representations of SB Partnership, Larry Gresham and Tiffany Gresham. Without the agreement of SB Partnership, Larry Gresham and Tiffany Gresham to this arrangement, Wolfpack would not have proceeded with the Ireland venture.

18. Throughout the Fall of 2015 and into the Winter of 2016 [sic], Wolfpack, SB Partnership, Larry Gresham and Tiffany Gresham continued to meet periodically to discuss Wolfpack's sales and distribution of SB Partnership's products and the progress of the Ireland facility. At no time prior to the wrongful termination of the Exclusive Distributorship Agreement did SB Partnership, Larry Gresham or Tiffany Gresham tell Wolfpack that they were withdrawing their commitments referenced above or that they had intentions of severing their relationship with Wolfpack.

19. In reliance upon the commitments of SB Partnership, Larry Gresham and Tiffany Gresham referenced above, Wolfpack invested substantial monies to the Ireland facility

20. Upon information and belief, and as shown herein, the affirmative representations made by SB Partnership, Tiffany Gresham and Larry Gresham referenced above constitute false statements of material facts made with the intent to defraud Wolfpack. Wolfpack relied on those false statements and was injured thereby as described herein.

21. In the spring of 2016, while the Exclusive Distribution Agreement was still in full force and effect, Wolfpack purchased and paid for about $2,400,000.00 dollars in e-liquid products from SB Partnership in anticipation of ramping up its international sales efforts for those products. As part of these expanded marketing and sales efforts, Wolfpack made substantial investments to arrange for a warehouse distribution facility in Ireland, solely to distribute SB Partnership's product line internationally.

22. Upon information and belief, and unbeknownst to Wolfpack, in 2016 at the same time Wolfpack purchased products from SB Partnership and made expansion plans into Ireland, SB Partnership was making arrangements with Triton to replace Wolfpack with Triton as the exclusive distributor for SB Partnership's products.

23. Wages is the principal of Triton. Wages who was formerly employed by Wolfpack and subsequently hired by SB Partnership, had full knowledge of the terms and conditions of the Exclusive Distributorship Agreement and of the investments being made by Wolfpack and the purchases of SB Partnership products being made by Wolfpack based upon that agreement.

24. Upon information and belief, at the time that the Exclusive Distributorship Agreement was in full force and effect and unbeknownst to Wolfpack, Triton and Wages were actively inducing SB Partnership to breach the Exclusive Distributorship Agreement with Wolfpack by allowing Triton to market SB Products, to immediately terminate that Exclusive Distributorship Agreement with Wolfpack and to replace Wolfpack with Triton as the exclusive distributor for SB Partnership's products. Since that time, Wolfpack has learned that SB Partnership was in fact marketing some of its products through Triton before the purported termination of the Exclusive Distributorship Agreement in violation of that agreement.

25. On or about May 2, 2016, with no prior notice to Wolfpack, Tiffany Gresham of SB Partnership announced to Wolfpack that SB Partnership was terminating the Exclusive Distribution Agreement effective immediately and that SB Partnership was going to use Triton as the exclusive distributor for its products. This action by SB Partnership was in breach of the provisions of the Exclusive Distribution Agreement.

26. At the time of the improper termination of the Exclusive Distributorship Agreement described above, Wolfpack still had approximately $500,000.00 worth of SB Partnership's products in its inventory.

27. At the time that SB Partnership informed Wolfpack that it was terminating the Exclusive Distributorship Agreement, Wolfpack requested that SB Partnership repurchase the remaining inventory of SB Products from Wolfpack. Initially, SB Partnership agreed to repurchase its products from Wolfpack. However, SB Partnership subsequently reneged on that offer and instructed Wolfpack to sell-off all remaining inventory as quickly as possible. At that time, SB Partnership also informed Wolfpack that Triton would begin distribution of SB Partnership products at the end of that week. True and correct copies of emails from SB Partnership evidencing these communications are attached hereto as Exhibit D and incorporated by reference.

28. At no time has Wolfpack (or any other Defendants) ever manufactured, advertised, distributed, sold or offered for sale any products under the name of any product in the SB Partnership's product line other than the e-liquids purchased by Wolfpack from SB Partnership under the Original Distributorship Agreement or the Exclusive Distributorship Agreement, which was labeled, bottled and sold pursuant to and in accordance with those agreements, or purchased from an authorized third-party re-seller. Wolfpack has fully performed all of its obligations under the Exclusive Distributorship Agreement.

29. Wolfpack incurred substantial losses resulting from the wrongful acts of Third Party Defendants including, but not limited to, losing its investment in the warehouse distribution facility in Ireland and having to quickly sell-off all SB Partnership's products in its inventory at whatever prices it could get after SB Partnership wrongfully terminated that agreement.

*Id.* ¶¶ 14-29.

On October 17, 2017, Third Party Defendants moved to dismiss Wolfpack's contract and fraud claims, as well as its request for attorney's fees under Chapter 38, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, Third Party Defendants contend that Wolfpack should be required to amend its pleadings under Rule 12(e), applicable to motions for more definite statement.

## II. Third Party Defendants' Rule 12(b)(6) Motion to Dismiss

### A. Standard for Rule 12(b)(6) - Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). In this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion.

*Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corporation*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

### B.    Analysis

#### 1.    Breach of Contract

##### a.    The Parties' Contentions

Third Party Defendants contend that Wolfpack's contract claim for "Breach of Exclusive Distribution Agreement" fails because it is based on a contract that is unenforceable under Texas law.  Third Party Defendants contend that the Exclusive Distribution Agreement is unenforceable under the statute of frauds in section 2.201 of the Texas Business and Commerce Code because the copy of the agreement attached to Wolfpack's pleadings is not signed by SB Products. Third Party Defendants further contend that Exhibit C to Wolfpack's Complaint does not support its allegations that SB Partnership, "through a series of emails," accepted the Exclusive Distribution Agreement, gave written confirmation of the agreement, or indicated that it would sign the agreement. Third Party Defs.' Mot. 9 (quoting Wolfpack's Third Party Compl. ¶ 11).  According to Third Party Defendants, the April 2014 e-mails in Exhibit C do not prove that the Exclusive Distribution Agreement was agreed upon and, at most, show only that negotiations were continuing.  In addition, Third Party Defendants contend that there is insufficient information in the e-mails to support the implication that they pertain to the alleged Exclusive Distribution Agreement. Third Party Defendants, therefore, argue that SB Products' April 21 e-mail response, "It looks like this is fine for us. I will read it through today," shows that SB Products did not agree to the "unknown and unplead 'revision to the previous contract'" and "stated only that it would review the attachment." Third Party Defs.' Mot. 9-10 (quoting Ex. C to Wolfpack's Compl.).  Third Party Defendants contend that, while "an exchange of emails, letters, or writings between parties may constitute a contract that fulfills all the requirements of the statute of frauds, the [April 2014] email chain relied

upon by Wolfpack does not" because, unlike the written confirmations in *Westlake Petrochemicals, LLC v. United Polychem, Incorporated*, the e-mails relied on by Wolfpack do not include the essential terms of the Exclusive Distribution Agreement, confirm any such agreement, or include any language indicating that a final agreement or an acceptance of contractual terms was reached. Third Party Defs.' Mot. 10-11 (quoting 688 F.3d 232, 241 (5th Cir. 2012)).

Wolfpack disagrees and contends that its allegations are sufficient to establish the existence of an enforceable contract and that it performed under the contract. Wolfpack further asserts, based on Fifth Circuit authority, that writings that do not form a contract themselves can satisfy section 2.201(a) because "[t]he statute only requires (1) some writing sufficient to indicate that a contract for sale has been made, (2) a signature (in a loose sense), and (3) a quantity term." Wolfpack Resp. 8-9 (quoting *Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Int'l, Ltd.*, 7 F.3d 1230, 1233 n.6 (5th Cir. 1993) (citation and internal quotation marks omitted)). Wolfpack also contends that e-mails have been held to satisfy section 2.201(a) because the Uniform Commercial Code does not require that the contract itself be in writing, only evidence regarding the existence of the contract and its essential terms. Wolfpack Resp. 9 (citing *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295 (5th Cir. 2002); and *Westlake Petrochemicals, LLC*, 688 F.3d at 241). Wolfpack further contends that, contrary to Third Party Defendants' argument, it is not relying solely on the e-mail exchange in Exhibit C but, instead, "has pled that there are other writings evidencing the acceptance of the Exclusive Distribution Agreement by Third Party Defendants," and [t]hese pleadings, taken as true, are sufficient to meet all Statute of Frauds requirements." Wolfpack Resp. 9 (citing Wolfpack's Third Party Compl. ¶ 11). Wolfpack contends that the cases relied upon by Third Party Defendants dealt with the issue of whether dismissal of a breach of contract claim based on the statute of frauds

was appropriate at the summary judgment or directed verdict stage, and, thus, are inapposite because they were decided after evidence was received and considered, not in the context of a motion to dismiss based on the pleadings.

Third Party Defendants reply that the e-mail exchange attached as Exhibit C to Wolfpack's Complaint undermines its contention that SB Products accepted and agreed to the terms of the Exclusive Distribution Agreement. Third Party Defendants reassert their position that these e-mails show only that negotiations regarding the Exclusive Distribution Agreement were continuing. Third Party Defendants assert that, because the e-mails contradicts and disproves Wolfpack's allegations, the e-mail controls. Third Party Defs.' Reply 4 (citing *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)). Third Party Defendants also contend that, contrary to Wolfpack's response, its pleadings do not support its contention that there are "other writings" evidencing SB Partnership's acceptance of the Exclusive Distribution Agreement.

### b.    Discussion

Both parties acknowledge that Wolfpack's claims are governed by Texas law and Texas's UCC provisions applicable to the sale of goods. For the reasons that follow, the court determines that Wolfpack's breach of contract pleadings are sufficiently specific at this stage, and Third Party Defendants are not entitled to dismissal of this claim based on their contention that no binding agreement was reached; nor is dismissal appropriate based on their affirmative defense that the alleged agreement violates the statute of frauds and, thus, is unenforceable.

### i.    Contract Formation

The existence of a valid contract is one of the essential elements of a breach of contract claim. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2008,

no pet.). Third Party Defendants focus on this element and dispute whether the Exclusive Distribution Agreement is "enforceable" given that it is not signed by SB Products. In addition, Third Party Defendants contend, based on the April 2014 e-mails attached to Wolfpack's Complaint as Exhibit C, that no agreement was ever reached, and Wolfpack's Complaint contains no other allegations regarding "other writings" evidencing SB Partnership's acceptance of the Exclusive Distribution Agreement. Under Texas law, the issue of whether a particular agreement is legally enforceable is a question of law, but the issue, when disputed, of whether an agreement was reached at all, is a question of fact. *Westlake Petrochemicals, LLC*, 688 F.3d at 238 (footnotes and citations omitted).

"One policy goal of the UCC is to liberalize the formation of contracts so that the parties' intentions are not frustrated by the difficulties of fitting a transaction into the traditional common-law model of offer and acceptance." *Id.* at 198 (citations omitted). Thus, under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract . . . even though the moment of its making is undetermined," and "one or more terms are left open." Tex. Bus. & Com. Code Ann. § 2.204(a)–(c).[2] "Conduct by both parties which recognizes the existence of a contract

---

[2] The commentary to section 2.204 further provides:

Under subsection (1) appropriate conduct by the parties may be sufficient to establish an agreement. Subsection (2) is directed primarily to the situation where the interchanged correspondence does not disclose the exact point at which the deal was closed, but the actions of the parties indicate that a binding obligation has been undertaken. Subsection (3) states the principle as to "open terms" underlying later sections of the Article. If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon

is [also] sufficient to establish a contract for sale *although the writings of the parties do not otherwise establish a contract*. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title." *Axelson, Inc*., 7 F.3d at 1233 (quoting § 2.207(c)) (emphasis added). In determining the parties' intent, the court may consider their course of performance and course of dealing. *Id.* § 1.303; *Anadarko Petroleum Corp. v. Williams Alaska Petroleum, Inc*., 737 F.3d 966, 970 & n.3 (5th Cir. 2013); *Orthoflex, Inc. v. ThermoTek, Inc*., 983 F. Supp. 2d 866, 873, 877 & n.14 (N.D. Tex. 2013).

Here, it is not entirely clear from Wolfpack's pleadings what events or communications took place before and after the April 2014 exchange of e-mails. Regardless, because Wolfpack alleges that the parties' agreement is set forth in the Exclusive Distribution Agreement attached to Wolfpack's Complaint, and their agreement to execute the Exclusive Distribution Agreement is evidenced by their conduct, that is, their written communications and performance under that agreement, its pleadings are sufficiently specific for the court to reasonably infer that a contract for the sale of goods was made for purposes of section 2.204 of the UCC. No more is required at this stage under Federal Rule of Civil Procedure 8. Given these allegations, it is also irrelevant whether SB Products and the Greshams accepted the proposed revisions to the agreement in the April 2014 e-mail because the court need not determine at this juncture what terms the parties intended to include in any agreement between them. *See Axelson, Inc.*, 7 F.3d at 1233 ("The conduct of the

---

enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

parties here recognizes the existence of a contract. The parties' writings do not agree on a particular cancellation provision, so the law provides one.") (citing UCC sections 2.207, 2.703, 2.708) (footnote omitted). Instead, the need only determine whether Plaintiff's pleadings are sufficient to support a determination under the Texas UCC that a contract for the sale of goods was made.

While Third Party Defendants focus solely on the 2014 e-mail exchange and disagree that Wolfpack's pleadings support its contention that "other writings" evidence SB Partnership's acceptance of the Exclusive Distribution Agreement, Wolfpack alleges that SB Partnership accepted the agreement "through a series of emails" and "one of those emails is attached hereto as Exhibit C." Wolfpack's Compl. ¶ 11. It also alleges that, "throughout the relationship between the parties, the terms of the Exclusive Distributorship Agreement were acknowledged and its terms were followed in numerous ways including, inter alia, email communications, placing orders for product, delivering product, paying for product, marketing product, etc." *Id.* ¶ 12. Thus, accepting these allegations and Wolfpack's other allegations as true, as it must, the court determines that Wolfpack's pleadings regarding the existence of a contract are sufficient at this stage for purposes of UCC section 2.204(a)-(c). To the extent that Third Party Defendants dispute that a contract for the sale of goods was reached or contend that they did not agree to all terms in the Exclusive Distribution Agreement, these are factual issues that are better left for resolution at the summary judgment stage or trial. The court, therefore, will deny Third Party Defendants' Motion to Dismiss Wolfpack's contract claim on this ground.

### ii.    Statute of Frauds

The statute of frauds in section 2.201 of the Texas Business and Commerce Code "requires a writing sufficient to indicate that a contract for the sale of goods for the price of $500 or more has

been made between the parties and signed by the party against whom enforcement is sought." *Duradril, LLC v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 158 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citations omitted). The statute of frauds is an affirmative defense to a breach of contract claim that renders contracts within its purview unenforceable. *Id.* at 158.

Because the Exclusive Distribution Agreement is not signed by Third Party Defendants, the parties sought to be charged in this case, the agreement is unenforceable unless an exception to the statute of frauds applies. UCC section 2.201 contemplates three exceptions—the merchant exception, receipt and acceptance exception, and the partial performance exception—that will take a transaction out of the statute of frauds. *See* Tex. Bus. & Com. Code Ann. § 2.201(b), (c)(3).

Regarding the merchant exception, section 2.201(b) provides:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received.

*Id.* § 2.201(b).

"Under the partial-performance exception to the statute of frauds, contracts that have been partly performed but do not meet the requirements of the statute of frauds may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Duradril, LLC*, 516 S.W.3d at 160 (citing *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 192 (Tex. App.—Dallas 2013, pet. denied); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied)). "The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead

the statute, would reap an unearned benefit." *Id.* at 439. Partial performance, therefore, "takes a contract out of the statute of frauds when the party seeking enforcement of the contract *partially performed*." *Duradril, LLC*, 516 S.W.3d at 161 (citation omitted). The partial performance, however, must be "'unequivocally referable' to the agreement and corroborative of the fact that a contract actually was made." *Id.* (quoting *National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015) (per curiam); and *Berryman's*, 418 S.W.3d at 192). To satisfy this requirement, the partial performance at issue "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced." *Id.* at 193 (citation and internal quotation marks omitted).

Section 2.201(c)(3) provides that a contract is "enforceable with respect to goods for which payment has been made and accepted." "Receipt" of goods means taking physical possession of them. § 2.103(a)(3). Section 2.201(c) further provides that, "[a] contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable" when "the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made." § 2.201(c)(2).

Third Party Defendants contend that "the writings and/or actions described are not 'unequivocally referable' to the alleged Exclusive Distribution Agreement because the acts are not 'such as could have been done with no other design that to fulfill the particular agreement sought to be enforced." Third Party Defs.' Reply 4 (quoting *Exxon Corp.*, 82 S.W.3d at 439-40). Again, however, this argument focuses on the April 2014 e-mail exchange attached to Wolfpack's Complaint as Exhibit C while ignoring or contending that Wolfpack's other pleadings regarding the parties' performance, Wolfpack's payment and receipt of E-liquid products, and millions of dollars

of sales of the products between 2014 and 2016 before SB Partnership terminated the agreement, *see* Wolfpack Compl. ¶¶ 12, 13, 15, 21, are insufficient. Because the Original Distribution Agreement automatically terminated by its own terms on March 1, 2014, and Wolfpack alleges that the Exclusive Distribution Agreement modified and replaced the Original Distribution Agreement, the court determines that the foregoing pleadings by Wolfpack regarding the parties' performance, its payment for, receipt of, and sale of products under the Exclusive Distribution Agreement are sufficient at this stage of the litigation to take the agreement out of the statute of frauds based on the partial performance or receipt and acceptance exception.[3]

Moreover, as correctly noted by Wolfpack, the cases relied on by Third Party Defendants dealt with this issue at the summary judgment or trial stage. The Fifth Circuit, however, has explained that dismissal under Rule 12(b)(6) based on the affirmative defense of statute of frauds is not appropriate unless the defense appears on the face of the complaint:

> It is a well-known principle of federal law that federal procedure requires only notice pleading, "a short and plain statement of the claim showing that the pleader is entitled to relief." Although dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint. The Statute of Frauds has traditionally been considered an affirmative defense. *See* Fed. R. Civ. P. 8(c); *Automated Med. Lab., Inc. v. Armour Pharm. Co.*, 629 F.2d 1118 (5th Cir. 1980).

> EPCO pleaded that a written offer was extended to EPCO by Chase on the date of the May 2004 agreement. EPCO also pleaded that it accepted this offer. Under the liberal notice-pleading standard of rule 8, this was a sufficient pleading to provide notice to Chase of the factual basis for EPCO's claim.

> Chase argues, and the magistrate judge agreed, that EPCO should be required to plead either that the May 2004 agreement was signed by the parties or that the parties agreed to transact by electronic means. This argument misunderstands the rule

---

[3] The court expresses no opinion on whether any other exceptions apply as this issue was not addressed by the parties.

8 requirement. "Parsing the allegations into elements has never been required." EPCO's pleadings need not identify every element of its claim, particularly whe[n] the contested elements relate to the affirmative defense of the statute of frauds.

. . . .

EPCO has not conceded that its claim is based on an oral representation of Chase or on an unsigned agreement. Consistent with its pleadings, EPCO may be able to show that its acceptance was in the form necessary to satisfy the Credit Agreement Statute, either by submitting proof that its agreement with Chase was in a written, signed document or proof that it submitted its acceptance of Chase's offer electronically and that the two parties had agreed to conduct business electronically. Neither of these factual scenarios is foreclosed by the face of EPCO's pleadings, so dismissal at this early stage was improper.

*EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466 (5th Cir. 2006) (footnotes omitted). While the Exclusive Distribution Agreement attached to Wolfpack's Complaint is not signed, dismissal based on Third Party Defendants' statute of frauds affirmative defense is not proper because, even assuming that Third Party Defendants never signed the agreement, Wolfpack's pleadings do not foreclose the possibility that an exception under section 2.201 applies to take the agreement out of the statute of frauds. The court also disagrees that Wolfpack's pleadings regarding Third Party Defendants' statute of frauds affirmative defense need to be more specific for purposes of Rule 8's liberal pleading standard. *See id.* Accordingly, the court will deny Third Party Defendants' Motion to Dismiss Wolfpack's contract claim based on their statute of frauds defense.

**2. Fraud**

Third Party Defendants contend that Wolfpack's fraud claim similarly fails because it is nothing more than a "re-packaged breach of contract claim" and an attempt to enforce the unenforceable Exclusive Distribution Agreement, or an unenforceable promise. Third Party Defs.' Mot. 12. Alternatively, Third Party Defendants contend that the claim is not pleaded with sufficient

particularity to satisfy Federal Rule of Civil Procedure 9(b)'s specificity requirement, and Wolfpack fails to allege that Third Party Defendants made any affirmative misrepresentations or had a duty to disclose information allegedly withheld.

"Generally, under Texas law, a plaintiff may not recover in tort for claims arising out of an unenforceable contract under the statute of frauds." *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 470 (5th Cir. 2002) (citing *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001), which held "that the Statute of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds."). On the other hand, if "a plaintiff's fraud claim seeks out-of-pocket damages incurred by relying upon a defendant's misrepresentations, those damages are not part of the benefit of any bargain between the parties" and, therefore, may be recoverable under *Haase* "without contravening the statute of frauds." *Hugh Symons Group, plc*, 292 F.3d at 470 (citation omitted). Wolfpack contends, and the court agrees, that its fraud claim does not arise out of the Exclusive Distribution Agreement or the parties' obligations under that alleged agreement, and the court has already determined that it is too early to say whether the Exclusive Distribution Agreement is enforceable under the statute of frauds.

"Fraud by non-disclosure is simply a subcategory of fraud because, whe[n] a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). To state a claim for fraud by nondisclosure, the plaintiff must allege that:

> (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity

to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge.

*Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied). When a defendant has a duty to speak but remains silent, his silence is tantamount to a false representation.

*American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997). A duty to speak arises when:

(1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth.

*Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet. denied) (citation omitted).

As previously noted, Wolfpack alleges in relevant that, in September 2015:

[It] had meetings with SB Partnership, Larry Gresham and Tiffany Gresham to discuss the possibility of establishing a warehouse facility in Ireland to increase distribution of SB Partnership's products in Europe. Wolfpack stated that it would fund the up-front costs of that venture if: (i) SB Partnership would provide discounted prices to Wolfpack for SB Partnership products that would be sold in Europe through the new facility in Ireland; and (ii) SB Partnership, Larry Gresham and Tiffany Gresham would commit to a long term arrangement for Wolfpack to be the exclusive distributor of SB Partnership products in Europe so that Wolfpack could recoup the costs associated with the establishment of the Ireland facility. SB Partnership, Larry Gresham and Tiffany Gresham said that they would commit to this arrangement and encouraged Wolfpack to move forward with the Ireland facility. Wolfpack proceeded in reliance upon the representations of SB Partnership, Larry Gresham and Tiffany Gresham. Without the agreement of SB Partnership, Larry Gresham and Tiffany Gresham to this arrangement, Wolfpack would not have proceeded with the Ireland venture.

Pl.'s Compl. ¶ 17. Wolfpack further alleges that:

SB Partnership was fully aware of Wolfpack's planned investments and encouraged Wolfpack to move forward with those plans. Upon information and belief, at the same time SB Partnership, Larry Gresham and Tiffany Gresham were secretly conspiring with Triton to terminate the Exclusive Distributorship Agreement and replace Wolfpack with Triton.

*Id.* ¶ 35. These allegations are sufficient to give rise to a duty to speak because new information, Third Party Defendants' decision to terminate the Exclusive Distributorship Agreement and use Triton as its exclusive dealer of E-liquid products, made their earlier representation to Wolfpack, that they "would commit to a long term arrangement for Wolfpack to be the exclusive distributor of SB Partnership products in Europe so that Wolfpack could recoup the costs associated with the establishment of the Ireland facility," misleading or untrue. *See Holland*, 338 S.W.3d at 598.

Finally, regarding Third Party Defendants' contention that Wolfpack's pleadings do not satisfy Rule 9(b)'s specificity requirement, Rule 9(b) imposes a heightened level of pleading for fraud claims: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). Although the particularity demanded by Rule 9(b) differs with the facts of each case, *see Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992), a plaintiff pleading fraud must set forth "the who, what, when, and where . . . before access to the discovery process is granted." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).

Wolfpack's response to Third Party Defendants' Motion to Dismiss addresses this issue at length, and the court agrees that its pleadings regarding its fraud claim satisfy "the who, what, when, and where" requirement. Accordingly, dismissal on this ground is not warranted and does necessitate amendment of Wolfpack's pleadings. *See Cates v. Int'l Tel. and Telegraph Corp.*, 756

F.2d 1161, 1180 (5th Cir. 1985) (explaining that a plaintiff's failure to meet the specific pleading requirements does not justify dismissal of a claim on the merits without leave to amend).

### 3.      Attorney's Fees

Third Party Defendants contend that Wolfpack's claims for attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code against the Greshams should be dismissed.  Third Party Defendants assert that Wolfpack has not pleaded that a contract exists between Wolfpack and the Greshams as required to recover attorney's fees under Chapter 38, and it cannot rely on the Exclusive Distribution Agreement or oral "Ireland Agreement," as both are unenforceable under Texas law. Third Party Defendants contend that the Greshams cannot be held liable in their capacity as partners for any debts of SB Products because, under Texas law, a partnership's acts are only its own, not a partners. Wolfpack disagrees that it is not entitled to attorney's fees. Third Party Defendants' Mot. 21.

The court normally addresses the issue of attorney's fees postjudgment, upon application, pursuant to Federal Rule of Civil Procedure 54(d). Accordingly, the court **denies** as premature Third Party Defendants' motion to dismiss with prejudice at this time Wolfpack's request for attorney's fees.

## III.      Motion for More Definite Statement

Third Party Defendants contend that Wolfpack's pleadings are so imprecise and vague that they "are unable to properly respond because doing so would greatly prejudice them in attempting to answer Wolfpack's poorly pleaded Complaint."  Third Party Defs.' Mot. 25.

As stated above, Federal Rule of Civil Procedure Rule 8(a)(2) requires only that a complaint set forth a "short and plain statement of the claim showing that the pleader is entitled to relief."  If

the complaint is "so vague or ambiguous that the party cannot reasonably prepare a response," a party may move for a more definite statement of the claim or claims against it under Federal Rule of Civil Procedure Rule 12(e). Rule 12(e) motions, however, are generally disfavored given the liberal pleading standard set forth in Rule 8(a), *Travelers Indem. Co. of Conn. v. Presbyterian Healthcare Res.*, 313 F. Supp. 2d 648, 654 (N.D. Tex. 2004), and are normally granted only when a complaint is "so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Phillips v. ABB Combustion Eng'r, Inc.*, No. 13-594, 2013 WL 3155224, at *2 (E.D. La. June 19, 2013). When a defendant "complain[s] of matters that can be clarified and developed during discovery, not matters that impede his ability to form a responsive pleading . . . [a]n order directing [the plaintiff] to provide a more definite statement is not warranted." *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 972 (N.D. Tex. 2006) (citing Rule 12(e) and *Mitchell v. E–Z Way Towers, Inc.*, 269 F.2d 126, 132 (5th Cir. 1959), for the proposition that Rule 12(e) is not to be used as a substitute for discovery). A district court's decision of whether to grant a motion for a more definite statement is discretionary. *Travelers Indem. Co. of Conn.*, 313 F. Supp. 2d at 654 (citing *Mitchell*, 269 F.2d at 130).

Third Party Defendants quote a number of paragraphs from Wolfpack's pleadings but do not explain why they believe they are so "imprecise and vague" that they cannot prepare a response. The court has reviewed Wolfpack's pleadings with respect to the claims at issue and determines, for the reasons already discussed, that they are sufficiently specific, that is, Wolfpack has stated its claims with sufficient specificity to permit Third Party Defendants to frame a responsive pleading. In other words, Wolfpack's allegations are not so vague that Third Party Defendants cannot admit or deny them, and any concerns raised by Wolfpack's pleadings can be clarified and developed through

discovery. Accordingly, the court will deny Third Party Defendants' alternative motion for more definite statement and request for the court to require Wolfpack to amend its pleadings.

**IV.      Conclusion**

For all of the reasons herein stated, the court **denies** Third Party Defendants' Motion to Dismiss Certain Claims in Wolfpack Wholesale, Inc.'s First Amended Third Party Complaint and alternative motion for more definite statement (Doc. 53).

**It is so ordered** this 13th day of September, 2018.

Sam A. Lindsay
United States District Judge